In the Matter of the Claim of Mrs. Leonard Andrews, Respondent, against Emporium Forestry Company and Another, Appellants.

State Industrial Board, Respondent.

Third Department, September 20, 1928.

*Jeremiah F. Connor*, for the appellants.

*Albert Ottinger, Attorney-General* [*E. C. Aiken, Assistant Attorney-General*, of counsel], for the respondents.

Davis, J. On November 17, 1926, Leonard Andrews was in the general employment of the Emporium Forestry Company at Conifer, N. Y., as assistant planing mill foreman. His duties were to see that the machines were running properly, inspect the finished

product, fix up the knives as they became dull, to assist in repairing machinery, and in directing the workmen. Every night after supper he returned to the mill to assist the night foreman in getting started.

On the night in question, Andrews had returned to the mill. It does not clearly appear whether he had finished his usual duties or whether they had not yet been begun. At any rate, as he was standing at a store, he noticed that smoke and sparks were coming out of the chimney of his home. Evidently thinking that there was a fire, he ran to his home, a distance of about one-eighth of a mile up grade. He was a large, heavy man fifty-two years of age. He arrived there exhausted, and it may be assumed that his death on December 2, 1926, was the result of pulmonary embolism, contributed to by dilatation of the heart, caused by the unusual strain and excitement in running to his home. There is no practical dispute in the facts. We disregard the admissions made in the " Employer's First Report " for the reason that the report was made out at the request of the employee by a man to whom no authority was given.

The only question requiring discussion is, Did the death of the employee result from an accident which arose out of and in the course of his employment?

Conifer is a small unincorporated village, consisting of a saw mill, planing mill, machine shop, lumber yard, hotel, and dwelling houses. There is no municipal government. All of the buildings (including the residences) except the school building are owned by the employer. Apparently the residences are rented to employees for their exclusive use.

There is a water system furnishing a supply of water for domestic purposes and for fire protection; and a system of fire hydrants is maintained, together with necessary appliances for fighting fire, all owned by the employer. There is also a fire alarm system. Certain of the employees have been organized into a fire company in charge of officers by whom they were given fire drills from time to time, and directed in fighting fires. Their duties are to turn out whenever an alarm of fire is given. These men are given extra pay for their services whenever called upon to perform such duties.

Andrews did not belong to this fire company. In common with other officers and employees, he did turn out at times when there was a fire and sometimes rendered assistance. For this he received no special pay, nor did he lose pay for the time he was absent from his duties. There was nothing in his contract of employment which required him to assist at fires; and so far as it appears, the employer did not direct his work on such occasions.

At the time he made this unusual exertion that led to his death there had been no alarm, and he was not acting in the line of his

regular or special employment regarding his duties at the mill; nor does it appear that he was in any way furthering the interests of his employer. His act was based upon the mistaken impression that the house in which he resided, owned by his employer, was in grave danger. When he reached home it was apparent there had been no great risk. His wife testified that the chimney was hot and that she threw some salt in the stove and that stopped the blazing of the chimney. Andrews gave no alarm and it is quite evident that his purpose in hastening to his home was to look after the safety of his wife and to protect his own property.

The determination as to whether the act of an employee at any given time falls within the scope of his employment or the line of his duty, must depend upon the surrounding facts and circumstances of the particular case under consideration. The law recognizes that an employee is an independent and responsible being, with capacity which the employer cannot efface or control, to engage in projects of his own and exercise freedom about his own affairs which takes him out of the scope of his employment and absolves the employer from responsibility for his acts. (18 R. C. L. § 254, p. 795.) If he engages in performing duties in behalf of his employer, even if it is outside the usual hours of labor, he is furthering the interests of his employer and the latter not only is responsible for his acts but becomes liable for compensation under the statute, if an accident befalls the employee during the course of this extra employment. (*Matter of Grieb* v. *Hammerle*, 222 N. Y. 382; and see note, 7 A. L. R. 1078.)

However, if the employee has departed from his ordinary line of duty and engages in an enterprise which is only remotely if at all related to his employment, and while thus engaged suffers from an accident, he may not recover compensation for the reason that the accident did not arise out of and occur in the course of his employment. (*Matter of DeVoe* v. *New York State Railways*, 218 N. Y. 318; *Cole* v. *Fleischmann Manufacturing Co.*, 189 App. Div. 306.) There may be no absolute presumption that the accident occurred in the course of employment, but the facts must be established from which the inference of compensable injury arising out of and in course of employment may logically be drawn. (*Joseph* v. *United Kimono Co.*, 194 App. Div. 568.)

Our decision in *Matter of Thompson* v. *City of Binghamton* (218 App. Div. 451) is urged upon our attention as controlling in the decision of this case. We think the facts are substantially different, so that it may be distinguished. In the *Thompson* case the employee was the janitor of the school and was required to go to the school building when the fire alarm was sounded. There was an alarm, although in fact there was no fire, and the employee went

to the schoolhouse in an automobile. He hurried into the building and rushed downstairs into the boiler room; two alarm bells were ringing. He attempted to disconnect the electric system; he was greatly excited and was taken with a heart attack resulting in his death. In performing his duty, Thompson had no personal interest to serve but was acting in behalf of his employer.

The chief controversy in that case was as to whether his death was caused by an accident. Without discussion it was stated (p. 453): " His injury was sustained while he was in the line of his duty; that is, in the course of his employment, and it fell upon him because of what occurred within the field of his employment, and because of what he did to serve the interest of his employer."

In this case, as has been stated, there was no alarm and no fire; and there is nothing but conjecture upon which to base a conclusion that the employee rushed to his own home in the interest of his employer, rather than for the purpose of protecting the safety of his wife and preventing injury to his property. The finding that Andrews was engaged in his regular course of employment at the time of the accident is without evidence to support it.

The award should be reversed and the claim dismissed, with costs against the State Industrial Board.

VAN KIRK, P. J., HINMAN and WHITMYER, JJ., concur; HASBROUCK, J., dissents with an opinion.

HASBROUCK, J. (dissenting). The conclusion reached in the opinion of the majority of the court is that the finding of the State Industrial Board that Andrews " was engaged in his regular course of employment at the time of the accident is without evidence to support it." With such conclusion I am at variance. There is no room for dispute of the proposition that if the master's property be menaced by fire it is the duty of the servant during employment to help put the fire out. It is argued that because no bell was rung, no alarm of fire given, that Andrews had no right to leave his employment at the manufacturing plant and run to his house. The purpose of the ringing of a bell or of an alarm is to announce the existence of a fire. Andrews needed no call of a bell or alarm. He saw the flames mounting from the chimney threatening his master's house and the destruction of Andrews' household goods. There was distress. There was an emergency and as has been said: " The call of distress is the summons to duty." The question as to what was the purpose in Andrews' mind is a question of fact. What purpose moved him to put out the fire? Whatever other motive may have laid behind such motive was incidental. Andrews was in his regular employment before he started for the fire. He was injured in getting to it. In his zeal he overtaxed his heart. The

reasoning of Brother DAVIS overlooks entirely the fact that Andrews may have entertained more purposes than to " look after the safety of his wife and to protect his own property." Why exclude concern for his master's property? Why deny Andrews the power to entertain more than one purpose? If he entertained the purpose of preserving his master's property besides looking after his wife and his own property surely death benefits ought not to have been denied his family. Let us analyze. The master built the houses to house his employees, their families and their household goods. Unless he housed them he could not hold them as employees. If workmen could not have their families with them, if they could not have the comforts of household goods, the master would lose the employee. It was, therefore, also in the interest of the master that the wife should be protected; that the workmen's household goods should not be destroyed. Thus the purpose of the master and the purpose of the workmen were joined together. When the workman went to save his furniture and protect his wife he went to save one of the ties which bound him to the service of the employer. But assuming that the protection of his household goods and of his family constitutes a purpose foreign to his duty to his employer, the fact remains that if he stepped out of his employment in so doing, the State Industrial Board, familiar with the law, knew that his death was not compensable. By the process of exclusion, therefore, it was permissible to reach the conclusion that when the Board found the fact of the purpose that animated the deceased in running to the fire it must have been that he did so to preserve his master's property. As evidence that he was in the regular course of his employment, what more is needed than that he was proceeding to the fire when he was injured from the place where he was occupied in his master's business to the place where his master's property was threatened by flames? If we assume that there was the question of fact before the State Industrial Board as to whether the deceased was running to the fire for himself or for his master, then the Board having decided that he was trying to serve his master the decision of fact is final. I am unable to distinguish *Matter of Thompson* v. *City of Binghamton* (218 App. Div. 451) from the claim at bar. My brother DAVIS attempts to do it by arguing that there was an alarm that summoned Thompson to the duty of attending the fire and upon the further ground that he had no personal interest to serve. It does not save a man from the consequences of his carelessness having seen an approaching train, that a bell was not rung or whistle blown. It does not call the servant who has seen a fire to duty more strongly if a bell is rung or other alarm given. Again the servant who has the duty of subduing the conflagration of his master's property is

not excluded from performing it because traveling beside such duty is the opportunity to serve a personal interest like that of protecting the safety of his family and saving his household furniture. The outstanding proposition is that in proceeding to put out the fire that was destroying his master's property he was serving his master even though it were a gratuitous act. (*Matter of Grieb v. Hammerle*, 222 N. Y. 382.) How much more should it be compensable when allied to duty?

Finally it seems to me, since the claimant when he sustained his injury may have been animated by more than one purpose, that the facts of the case support the presumption of the statute (Workmen's Compensation Law, § 21), " That the claim comes within the provision of this chapter."

The award should be affirmed, with costs to the State Industrial Board.

Award reversed and claim dismissed, with costs against the State Industrial Board.